UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CRISTIAN ROSAS ET AL.,<br><br>    Plaintiffs,<br><br>        v.<br><br>HI-TECH PHARMACEUTICALS,<br>    Defendant. | Case No.: CV 20-00433-DOC-DFM<br><br>ORDER RE: MOTION TO DISMISS [13] |

Before the Court is Defendant Hi-Tech Pharmaceuticals, Inc.'s ("Defendant") Motion to Dismiss ("Motion") (Dkt. 13). The Court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78; C.D. Cal. R. 7-15. For the reasons stated below, the Court **GRANTS** Defendant's Motion.

## I. Background

### A. Factual Background

Plaintiffs Cristian Rosas, Ralph Milan, and Tanner Ayoob (collectively, "Plaintiffs") purchased dietary supplemental products from Defendant that allegedly contain ingredients not safe for human consumption. *See* Compl. (Dkt. 1) ¶¶ 2, 19. Specifically, Plaintiffs purchased the following: "Mesomorph Pre-Workout," "DMAA Enhanced – Off the Chain Aminos," "HydroxyElite," and "Lipodrene: With 25mg Ephedara Extract" (collectively, the "Products"). *Id*. The products contain the ingredients 1,3-dimethylamylamine ("DMAA"), dimethylhexylamine ("DMHA"), and methylsynephrine. *Id*. ¶ 19.

DMAA and DMHA were originally developed for use in nasal decongestants, but their consumption has been shown to increase the uptake of dopamine and noradrenaline. *Id*. ¶ 20. Methylsynephrine is a stimulant used in pre-workout supplements that increases blood pressure and heart rate, but may cause nausea, vomiting, agitation, or cardiac arrest. *Id*. ¶ 21. The Food and Drug Administration ("FDA") considers DMAA, DMHA, and methylsynephrine not safe or approved for human consumption.[1] *Id*. ¶ 3.

The FDA issued a warning letter to Defendant on April 10, 2019 about its products that contain the ingredient DMHA. *See* Motion ("Mot.") (Dkt. 13) at 11:20. The FDA notified Defendant of the following:

> To the best of FDA's knowledge, there is no information demonstrating that DMHA was lawfully marketed as a dietary ingredient in the United States before

---

[1] *See DMAA in Products Marked as Dietary Supplements*, U.S. Food & Drug Administration (Aug. 7, 2018), https://www.fda.gov/food/dietary-supplement-products-ingredients/dmaa-products-marketed-dietary-supplements; *DMHA in Dietary Supplements*, U.S. Food & Drug Administration (Apr. 19, 2019), https://www.fda.gov/FOOD/DIETARY-SUPPLEMENT-PRODUCTS-INGREDIENTS/DMHA-DIETARY-SUPPLEMENTS; *Methylsynephrine in Dietary Supplements*, U.S. Food & Drug Administration (Nov. 29, 2017), https://www.fda.gov/food/dietary-supplement-products-ingredients/methylsynephrine-dietary-supplements.

> October 15, 1994, nor is there information demonstrating that this ingredient has been present in the food supply as an article used for human food in a form in which the food has not been chemically altered. . . . In the absence of a history of use or other evidence of safety establishing that DMHA . . . will reasonably be expected to be safe, dietary supplements containing DMHA as a new dietary ingredient are adulterated. . . . Adulterated foods cannot be legally . . . marketed in the United States. . . . You should take prompt action to correct the violations addressed in this letter. . . . Failure to immediately cease distribution of your products . . . that contain DMHA, could result in enforcement action by the FDA without further notice.

*See* Declaration of Theodora McCormick ("McCormick Declaration") (Dkt. 13), Ex. A at 39-40. The FDA has issued similar warning letters to manufacturers who use DMAA and methylsynephrine in their products. *See, e.g.*, Letter from Food and Drug Administration to SEI Pharmaceuticals (April 12, 2012) (on file with the Food and Drug Administration); Letter from Food and Drug Administration to Cordy Hooten, Chief Exec. Officer, Chaotic Labz (Mar. 31, 2016) (on file with the Food and Drug Administration).

Defendant challenged the FDA's attempt to ban DMHA in the District Court for the District of Columbia ("D.C. Action"), alleging it did not engage in the proper rulemaking process necessary to formally ban DMHA. *See* McCormick Decl., Ex. B ¶¶ 40-41. The District Court for the District of Columbia dismissed Defendant's case on June 29, 2020 because the FDA's warning letter did not constitute final agency action subject to judicial review. *See* Suppl. Authority (Dkt. 32) at 8.

### B. Procedural Background

On March 3, 2020, Plaintiffs filed a class action complaint pleading five causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), (2) violation of California's False Advertising Law ("FAL"), (3) violation of California's Unfair Competition Law ("UCL"), (4) negligent misrepresentation, and (5) intentional misrepresentation. *See generally* Compl. Defendant filed the instant Motion to Dismiss Plaintiffs' claims under the

doctrine of primary jurisdiction, among other grounds. On June 8, 2020, Plaintiffs filed their Opposition (Dkt. 15), and Defendant submitted its Reply (Dkt. 26) on June 22, 2020. Plaintiffs and Defendant also filed supplemental briefs (Dkts. 35 and 36, respectively) in response to the dismissal of the D.C. Action.

## II.     Legal Standard

The primary jurisdiction doctrine allows a court to either stay proceedings or to dismiss a complaint without prejudice "pending the resolution of an issue with the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). When exercising the doctrine, the court determines that "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Id.* (citing *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002)).

A district court may invoke the doctrine when a claim requires the "resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). However, it is not a doctrine that requires all claims within an agency's purview to be decided by the agency. *Id.* Rather it is a "doctrine used by courts to allocate initial decisionmaking responsibility between agencies and courts where such [jurisdictional] overlaps and potential for conflicts exist." *Syntek*, 307 F.3d at 780. Although the doctrine is discretionary, the Ninth Circuit has identified four factors in cases where courts have invoked primary jurisdiction: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987).

### III. Discussion

In addition to exercising primary jurisdiction, Defendant asks the Court to dismiss Plaintiffs' claims for the following reasons:

    (1) The Food, Drug, and Cosmetics Act ("FDCA") preempts Plaintiffs' claims;

    (2) plaintiffs lack standing;

    (3) the complaint fails to sufficiently plead violations of CLRA, FAL, UCL, negligent misrepresentation, or intentional misrepresentation; and

    (4) decline jurisdiction under the doctrine of judicial abstention.

*See generally* Mot. For the reasons discussed below, the Court need not address Defendant's additional grounds for dismissal.

Under the doctrine of primary jurisdiction, neither party contests that the Food and Drug Administration ("FDA") has regulatory authority and jurisdiction over the food industry. However, the parties do contend that (1) there is a need to resolve an issue that (2) requires the expertise of an administrative body. Specifically, Defendant claims that before Plaintiffs can allege any sort of false advertising claim, the FDA must have made a final agency determination as to whether DMAA, DMHA, and methylsynephrine are safe for human consumption, thereby requiring the agency's expertise. *See* Reply at 8:4-11, 22-25. Plaintiffs contend that the FDA has already classified DMAA, DMHA, and methylsynephrine as unsafe for human consumption and therefore the FDA's expertise is not required. *See* Opp'n at 24:10-21. The Court addresses each issue in turn.

### A. Whether the FDA has taken final agency action to determine whether DMAA, DMHA, and methylsynephrine are dietary supplements safe for human consumption

For an agency action to be final, (1) there must be a "consummation" of the agency's decision-making process that is not tentative or interlocutory and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (citations omitted). An agency's warning letters fail to satisfy either condition. *Dietary Supplemental Coalition, Inc. v. Sullivan*,

978 F.2d 560, 563 (9th Cir. 1992); *see also Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1377 (9th Cir. 1983) ("'[T]he type of informal letter issued by the FDA . . . does not constitute the kind of formal or final agency action the Supreme Court had in mind . . .'") (quoting *IMS Ltd. v. Califano*, 453 F. Supp. 157, 160 (C.D. Cal. 1977)).

Specifically, warning letters from the FDA do not mark the consummation of the agency's decision-making process. FDA warning letters give "firms an opportunity to take voluntary and prompt corrective action before [the agency] initiates an enforcement action." FOOD AND DRUG ADMINISTRATION, REGULATORY PROCEDURES MANUAL § 4-1-1 (2017). Violations of the FDA's warning letters "may lead to enforcement action," but such enforcement is not guaranteed. *Id*.

Here, Plaintiffs allege that the FDA has addressed the issue of whether DMAA, DMHA, and methylsynephrine are safe for human consumption through the use of warning letters. *See* Opp'n 23:8-20. Defendant claims that warning letters do not constitute final agency action. *See* Reply at 9:2-10. The Court agrees with Defendant. The language in the FDA's warning letter to Defendant represents neither the "consummation" of the agency's decision-making process nor an action from which legal consequences will flow. For instance, the letter states that Defendant "*should* take prompt action," not that it must. *See* McCormick Decl., Ex. A at 39-40 (emphasis added). The letter also notes that failure to cease distribution of products containing DMHA "could result in enforcement action," not that it will. *Id*. Moreover, even if the FDA has taken enforcement action against Defendant, Plaintiffs' use of warning letters to demonstrate a final rule or final agency action is unavailing. *Cf. Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1037 (10th Cir. 2006) (explaining the FDA's extensive notice and comment process to issue a final rule under DSHEA regulating the sale of ephedrine-alkaloid dietary supplements).

The Plaintiff relies on *Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015), to argue that the FDA had taken final agency position through its warning letters, thereby rendering primary jurisdiction inappropriate. *See* Opp'n at 23:13-16. In *Reid*, the plaintiff brought suit against defendants Johnson & Johnson and McNeil Nutritionals, LLC for the false claim that their product contained "no trans. fat" when it actually did. *Reid*, 780 F.3d at 956.

However, the Ninth Circuit in *Reid* noted that there was already an existing FDA regulation specifically addressing trans fat on nutrition labels:

> If the serving contains less than 0.5 gram, the content when declared, shall be expressed as zero . . . if a statement of the trans fat content is not required and, as a result, not declared, the statement "Not a significant source of trans fat" shall be placed at the bottom of the table of nutrient values.

21 C.F.R. § 101.9(c)(2)(ii). The FDA did not take a final position regarding the use of trans fat labels through its warning letters as Plaintiffs allege. Rather, "there [was] already an interim final rule on the books" from which the FDA based their warning letters. *Reid*, 780 F.3d at 966. *Cf.* S. Rep. No. 103-410, at 35 (1994) (Conf. Rep.) ("[When the FDA declares a dietary supplement adulterated under the Dietary Supplement Health and Education Act], the FDA would publish a notice in the Federal Register . . . setting forth the basis for their position that a substantial . . . risk of illness or injury is presented."). Here, however, neither party cited a similar regulation nor an "interim final rule" other than the FDA's warning letters.

Accordingly, the Court finds that the FDA has not taken final agency action to determine whether DMAA, DMHA, and methylsynephrine are safe for human consumption.

### B. Whether the issue of DMAA, DMHA, and methylsynephrine being dietary supplements and therefore safe for human consumption requires the expertise of the FDA or uniformity in administration

Classification of a product or ingredient as either a drug, biological product, or food involves the "determination of technical and scientific questions" best left to agency expertise. *Biotics*, 710 F.2d at 1377 (quoting *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654 (1973)). In such cases, a district court should decline to review "anything less than the final administrative determination on the classification of the product." *Dietary Supplemental Coalition, Inc. v. Sullivan*, 978 F.2d 560, 563 (9th Cir. 1992) (citing *Bentex*, 710 F.2d at 1377).

In 1994, Congress enacted the Dietary Supplement Health and Education Act ("DSHEA") to clarify labeling requirements on dietary products. Dietary Supplement Health and Education Act, S. 784, 103rd Cong. § 1 (1994). Under DSHEA, the FDA regulates dietary

supplements in a manner similar to food, preventing adulterated products from entering the market. *See* 21 U.S.C. § 331(a)-(c) (prohibiting adulterated food, drug, device, tobacco product, or cosmetic from entering interstate commerce).

Here, Plaintiffs claim that the Court does not need the FDA's expertise. *See* Opp'n at 24:9. Plaintiffs argue that the FDA has already issued the definition of a dietary supplement, and the Court need only determine whether the ingredients in question constitute dietary supplements within the meaning of the statute. *Id*. at 24:17-20. Defendant contends that the Court should leave the question of statutory interpretation of these products principally to the FDA. *See* Supp. Br. at 6:11-17. The Court agrees with Defendant and declines Plaintiffs' invitation.

Plaintiffs rely on *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1344 (11th Cir. 2019), to assert that courts do not need the FDA's expertise to determine whether certain ingredients constitute dietary supplements under DSHEA. *See* Opp'n at 24:23-27. The Eleventh Circuit in *Undetermined Quantities* concluded that Defendant's DMAA constituted a dietary supplement under DSHEA. *Id*. at 1344. Specifically, the court determined that DMAA was neither a "herb or other botanical" nor a "constituent" of an herb or other botanical to qualify as a dietary supplement under DHSEA. *Id*. at 1351. *See also* 21 U.S.C. § 321(ff)(1) ("The term 'dietary supplement' means a product . . . intended to supplement the diet that . . . contains one or more of the following dietary ingredients: an herb or other botanical . . . or constituent [of an herb or other botanical]").

Although the Court recognizes the Eleventh Circuit's interpretation, it declines the request to conduct an analysis here. Whether DMAA, DMHA, and methylsynephrine constitute dietary supplements under DSHEA requires the "determination of technical and scientific questions" best left to the FDA. *Biotics*, 710 F.2d at 1377 (quoting *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654 (1973)). Furthermore, if this Court proceeds with its analysis, it is possible that its interpretation may differ from that of other courts. The Northern District of California coming to a different interpretation of whether DMHA constitutes a dietary supplement under DSHEA than the Central District of California, for example, would

create problems in "uniformity of administration." *Gen. Dynamics Corp.*, 828 F.2d at 1362. Various courts reaching different conclusions as to whether DMHA or methylsynephrine constitute dietary supplements would create the exact conflict that the Ninth Circuit acknowledged in *Syntek* and *General Dynamics*.

Accordingly, the Court finds that the determination of DMAA, DMHA, and methylsynephrine as dietary supplements under DSHEA requires both the expertise of the FDA and uniformity in administration.

## IV.     Disposition

For the reasons set forth above, the Court **GRANTS WITHOUT PREJUDICE** Defendant's Motion to Dismiss.

DATED:   July 29, 2020

*[signature: David O. Carter]*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE